Matthew Clarke, OSB # 022758
KRUTCH LINDELL BINGHAM JONES, PS
5 Centerpointe Dr, Suite 400
Lake Oswego, OR 97035
(503) 210-1987
mkc@krutchlindell.com


James T. Anderson, OSB # 152404
KRUTCH LINDELL BINGHAM JONES, P.S.
3316 Fuhrman Avenue East, Suite 250
Seattle, WA 98102
(206) 682-1505
jta@krutchlindell.com

*Attorneys for Plaintiffs*

UNITED STATES DISTRICT COURT

DISTRICT OF OREGON

EUGENE DIVISION

| | |
|---|---|
| JASON HALSEY; DANIEL LEE; LILA BACKER; and MICHAEL McGARRY<br><br>Plaintiffs,<br><br>v.<br><br>AIRBUS HELICOPTERS S.A.S.; AIRBUS HELICOPTERS, INC.; SAFRAN HELICOPTER ENGINES USA, INC.; GLOBAL MEDICAL RESPONSE, INC.; REACH AIR MEDICAL SERVICES, LLC; MED-TRANS CORPORATION; LIFEPORT, LLC f/k/a LIFEPORT, INC.; STARR ADJUSTMENT SERVICES, INC.; STARR ADJUSTMENT SERVICES, INC. d/b/a STARR COMPANIES; STARR UNDERWRITING AGENCY, INC. f/k/a STARR AVIATION AGENCY, INC.; STARR UNDERWRITING AGENCY, INC. d/b/a | Case No.<br><br>**COMPLAINT**<br><br>Strict Product Liability; Negligence; Intentional and Negligent Spoliation<br><br>**JURY TRIAL DEMANDED** |

STARR COMPANIES; STARR
INSURANCE HOLDINGS, INC. d/b/a
STARR COMPANIES; STARR
GLOBAL HOLDINGS AG d/b/a STARR
COMPANIES; STARR
INTERNATIONAL COMPANY, INC.
a/k/a STARR INTERNATIONAL
COMPANY AG d/b/a STARR
COMPANIES; and STARR
COMPANIES,

                              Defendants.

COMES NOW Plaintiffs Jason Halsey, Lila Backer, Daniel Lee, and Michael McGarry, by and through their undersigned attorneys, and allege as follows:

## THE PARTIES

1.      Plaintiff Jason Halsey (Halsey) is an individual and citizen and resident of the State of Oregon, in Deschutes County.

2.      Plaintiff Lila "Ellie" Backer (Backer) is an individual and citizen and resident of the State of Oregon.

3.      Plaintiff Daniel Lee (Lee) is an individual and citizen and resident of the State of Oregon.

4.      Plaintiff Michael McGarry (McGarry) is an individual and citizen and resident of the State of Oregon.

**Airbus**

5.      Defendant Airbus Helicopters SAS ("Airbus France") is a French corporation or company with its principal place of business at the Marseille Provence Airport (Aéroport Marseille-Provence or Aéroport International Marseille Provence), at Aéroport International Marseille Provence, 13700 Marignane, France and/or at Aéroport International Marseille

Page 2 – COMPLAINT AND JURY DEMAND

Provence 13725 Marignane Cedex, France, and with its United States subsidiary corporation, Airbus Helicopters, Inc. at its facilities located at 2701 Forum Drive, Grand Prairie, Texas 75053 and at 1782 Airport Road, Columbus, MS 39701.

6.     Defendant Airbus Helicopters, Inc. ("Airbus USA") is a Delaware corporation with its principal place of business at 2701 Forum Drive, Grand Prairie, Texas 75053, and with registered agents for service of process as follows:  National Registered Agents, Inc., 199 Bryan St Suite 900, Dallas, Texas 75201-3136; National Registered Agents, Inc., 645 Lakeland East Dr. Ste. 101, Flowood, MS 39232; and National Registered Agents, Inc., 330 N Brand Blvd Suite 700, Glendale, CA 91203.

7.     Airbus France is a designer, manufacturer, seller, exporter, and distributor of helicopters worldwide, including into the United States and to customers in the United States, and in Oregon, from which Airbus France derives substantial revenues and profits – both from helicopter and helicopter component sales and distribution into the United States in general and from helicopter and helicopter sales and distributions, including the AS350 helicopter models (now marketed as H125 model helicopters), such as the AS350B3 helicopter, registered as N851AL ("the subject helicopter") that crashed on May 18, 2022 in Christmas Valley, Oregon, injuring the Oregon resident plaintiffs ("the helicopter crash" or "the crash"), as well as other helicopter models and their components, into Oregon specifically.  The United States generally, and Oregon specifically, are both major markets for Airbus France that it intentionally cultivates by marketing, selling, exporting, and distributing its helicopters and their components and replacement parts, including its AS350 model helicopters and their components and replacement parts, throughout the United States, and in Oregon specifically.  Airbus France's contacts with Oregon are continuous and systematic, it purposefully avails itself of the privilege of conducting business in Oregon, and continued substantial revenues and profits from Oregon helicopter

customers and distribution of its helicopters, including its AS350 model helicopters, as well as their component parts and replacement parts into Oregon, form a significant and important part of Airbus France's business operations and business plan.

8.      Airbus USA is a subsidiary of Airbus France that is heavily controlled by Airbus France, and serves the purpose of working in concert with Airbus France on the design, manufacture, assembly, export/import, distribution, and sale of Airbus helicopters, including the AS350 helicopters, to customers in the intentionally cultivated United States and Oregon markets.  As with its parent, Airbus France, Airbus USA derives substantial revenues and profits in the United States and in Oregon specifically both from helicopter and helicopter component sales and distribution into the United States in general and from helicopter and helicopter sales and distributions, including the AS350 helicopter models, such as the subject helicopter, as well as other helicopter models and their components, into Oregon specifically.  Oregon is a major market for Airbus USA that it intentionally cultivates by marketing, selling, importing, and distributing its helicopters and their components and replacement parts, including its AS350 model helicopters and their components and replacement parts, in Oregon and to Oregon customers.  Airbus USA's contacts with Oregon are continuous and systematic, it purposefully avails itself of the privilege of conducting business in Oregon, and continued substantial revenues and profits from Oregon helicopter customers and distribution of its helicopters, including its AS350 model helicopters, as well as their component parts and replacement parts, into Oregon, form a significant and important part of Airbus USA's business operations and business plan.

9.      Airbus France maintains Airbus USA as an on-paper separate entity because it desires to shield itself from liability, however, the reality is the companies are essentially one and the same, they at all material times act in concert with Airbus France controlling Airbus USA

and carrying out Airbus France's sales and distribution of its helicopters into the United States market, and each acts as the agent of the other in all respects related to the matters alleged in this lawsuit. Consequently, the jurisdictional contacts of each with Oregon are fully attributable to the other.

10.    Airbus France and Airbus USA are collectively referred to herein as "Airbus".

11.    Airbus helicopter models, including the AS350 helicopter model, such as the subject helicopter, have a history of defects and malfunctions that have resulted in crashes and severe injuries and deaths. When those crashes have occurred in the United States, Airbus additionally conducts activities in the United States and Oregon by a practice of attempting to heavily influence NTSB investigations for purposes of diverting attention away from potential malfunctions, defects, or safety issues with its helicopters, and attempting to acquire access to and alter helicopter wreckages and components unsupervised, without any notification to the victims or their representatives, and without proper photo, video, or other documentation of its activities.

12.    Airbus sold and distributed the subject helicopter into Oregon, as addressed in more detail below regarding the original distribution and sale of the helicopter, and Oregon is where the helicopter was operated and where it crashed and injured the four Oregon resident plaintiffs, giving rise to their claims here for their injuries in the crash.

13.    Airbus additionally subjected itself to the jurisdiction of Oregon by its improper conduct with, and spoliation of, the helicopter that crashed within Oregon borders and jurisdiction, including its private inspection of the wreckage, and removal and alteration of its components, which resulted in post-crash harm in Oregon to the four Oregon-resident plaintiffs, as also addressed further below.

**Safran**

14.    Defendant Safran Helicopter Engines USA, Inc. ("Safran") is a Delaware corporation with its principal place of business right next to Airbus USA's facility in Grand Prairie, Texas, at 2709 Forum Dr, Grand Prairie, Texas, 75052-8927, and is also registered to conduct business in the State of Oregon with its registered agent for service of process located in Marion County: Corporation Service Company, 1127 Broadway St NE Suite 310, Salem, Oregon 97301.

15.    Safran designs, manufactures, and supplies helicopter engines to Airbus for incorporation into its helicopter models, AS350 models, such as the subject helicopter, and works with Airbus to intentionally cultivate a market for such helicopters in Oregon, deriving substantial revenue and profits for their sales and distribution into Oregon, as well as sales and distribution of components and replacement parts, maintaining and cultivating continuous and systematic contacts with Oregon and purposefully availing itself of the privilege of conducting business in Oregon.

16.    The jurisdictional contacts of Airbus with Oregon involving helicopters equipped with, and designed to be equipped with, Safran engines are all attributable to Safran, with Airbus serving as a key player in Safran's product distribution into Oregon and the revenues derived therefrom manifesting as increased orders from and purchases by Airbus of Safran engines, as well as Safran's sale of components and replacement parts into Oregon for helicopters containing Safran engines that have been distributed into Oregon, or are otherwise owned, maintained, or based in Oregon.

17.    Safran's jurisdictional contacts with Oregon further include maintaining active registration with the Oregon Secretary of State to conduct business in the State of Oregon,

registry number 1191719-99, and maintaining an agent for service of process in Oregon, located in Marion County, Oregon.

18.     Safran additionally sold the subject helicopter's engine to Airbus for purposes of incorporation into the subject helicopter as the finished product to be sold to the end consumer, and Airbus' sale and distribution of the integrated subject helicopter with Safran's engine was into Oregon, as addressed in more detail below regarding the original distribution and sale of the helicopter, and Oregon is where the helicopter was operated and where it crashed and injured the four Oregon resident plaintiffs, giving rise to their claims here for their injuries in the crash.

19.     Safran additionally subjected itself to the jurisdiction of Oregon by its improper conduct with, and spoliation of, the helicopter that crashed within Oregon borders and jurisdiction, including its private inspection of the wreckage, and removal and alteration of its components, which resulted in post-crash harm in Oregon to the four Oregon-resident plaintiffs, as also addressed further below.

**Global Medical Response - AirMedCare Network**

20.     Defendant Global Medical Response, Inc. ("Global") is a Delaware corporation with its principal place of business at 209 State Highway 121 Bypass, Lewisville, TX 75067, and with Corporation Service Company d/b/a CSC-Lawyers Incorporating Service Company being its registered agent for service of process at 211 E. 7th Street, Suite 620 Austin, TX 78701-3218.

21.     Defendant REACH Air Medical Services, LLC ("Reach Air") is a limited liability company or other entity organized under the laws of California and owned and controlled by defendant Global, with its principal place of business at 4933 Bailey Loop, McClellan, CA 95652, and is also registered to conduct business in the State of Oregon with its registered agent for service of process located in Marion County: Corporation Service Company, 1127 Broadway St NE Suite 310, Salem, Oregon 97301.

22.     Defendant Med-Trans Corporation ("Med Trans") is a North Dakota corporation owned by, and a subsidiary of, defendant Global, with its principal place of business at 4400 State Highway 121 Suite 700, Lewisville, Texas 75056, and is also registered to conduct business in the State of Oregon with its registered agent for service of process located in Marion County: Corporation Service Company, 1127 Broadway St NE Suite 310, Salem, Oregon 97301.

23.     Global runs and controls one of the largest or the largest for-profit air medical transport (or "air ambulance") operations in the country, and owns, leases, maintains, and operates numerous helicopters and aircraft for its air ambulance operations all around the country, including in substantial operations in Oregon.

24.     Global runs its air ambulance operations through numerous Global-owned and controlled companies and corporations, including defendants Reach Air and Med Trans, and often under and using the marketing name of AirMedCare Network for its profit-generating air ambulance operations all around the country, including in Oregon.

25.     Though Global describes AirMedCare Network as an "alliance" of purportedly separate air ambulance operations, AirMedCare Network is not an "alliance" of independent companies, but rather a single operation ran and controlled by Global as a major for-profit air ambulance enterprise, possibly the largest in the United States, using companies fully owned and controlled by Global.

26.     Global, through operation of its for-profit air ambulance network, including as AirMedCare Network, and through control of its owned companies that, though branded as separate air ambulance companies, are all extensions of Global's air ambulance operation and enterprise, maintains continuous and systematic contacts with Oregon, intentionally cultivates a market in Oregon, and purposefully avails itself of the privilege of conducting business in Oregon, through multiple air ambulance operations based and stationed in Oregon, employing

Oregon residents, and generating money from Oregon hospitals, medical facilities, and Oregon resident patients, and reaching into Oregon to profit off of and cultivate additional subscribing Oregon-resident customers through selling advance subscription air ambulance services through its AirMedCare Network website.

27.    Global additionally orchestrated the purchase of the subject helicopter for use in Oregon by Med Trans, under the marketing name AirLink Critical Care Transport ("AirLink") (www.airlinkcct.com), after modification of the interior space for its intended operation in Oregon as an AirLink Critical Care Transport air ambulance.

28.    Though Global used its wholly owned company Reach Air to act as the on-paper purchaser of the subject helicopter from Airbus, it was all part of Global's single enterprise air ambulance operation with the subject helicopter to be stationed in Oregon and used by Med Trans under the AirLink marketing name.  To that end, Global and Reach Air acted together immediately upon purchase of the subject helicopter to have the interior modified for air ambulance operations with the LifePort, Inc. air ambulance modifications and seats, for purposes of being operated in Oregon, then transferred title to a title-holding company, which then "leased" back the subject helicopter to Med Trans for its operation and maintenance of the helicopter in Oregon as an AirLink air ambulance.

29.    Despite all of the on-paper shuffling of company names, the subject helicopter was functionally and for all purposes legally originally distributed by Airbus into Oregon for use as an air ambulance in Oregon, with interior modifications to make it an air ambulance, by Global's singular air ambulance enterprise "AirMedCare Network" operation.

30.    Reach Air and Med-Trans both have permanent air ambulance operations, directly in their name, in the State of Oregon.

31.     One of Reach Air's Oregon operations is located in Douglas County at 2131 NW Aviation Drive, Suite 4, Roseburg, OR, 97470.  Another one of Reach Air's Oregon operations is located in Coos County at 1180 Airport Way, North Bend, OR, 97459.

32.     Two of Med-Trans' Oregon operations are in Deschutes County, both of them in Bend, Oregon.

**LifePort**

33.     Defendant LifePort, LLC f/k/a LifePort, Inc. is a Washington company with its principal place of business at 1610 Heritage St, Woodland, WA 98674.  LifePort, Inc., was a Washington corporation with its principal place of business at 1610 Heritage St, Woodland, WA 98674.  On March 21, 2019, LifePort, Inc. was converted from a profit corporation to a limited liability company – LifePort, LLC.  For all purposes here regarding acts/omissions and liability, LifePort, LLC and LifePort, Inc. are the same entity.  LifePort, LLC and LifePort, Inc. are referred to collectively hereafter as "LifePort".

34.     LifePort designs, manufacturers, and sells aircraft modifications, including modifications to helicopters and their interiors and seating for air ambulance operations. LifePort further states on its website that "LifePort is a global leader in design, manufacturing, certification, and integration of aerospace solutions, including air medical, armor, and custom cabinetry interiors", that it has "a portfolio of more than 1,000 products" and that it is "committed" to "providing safe . . . products and services."

35.     With respect to its air ambulance seating designs and products, LifePort warrants that its "LifePort's medical seating epitomizes . . . safety" and also that "LifePort's medical seating ensures safety . . . during critical care or routine facility transfers."

36.     LifePort intentionally cultivates a market for its aircraft modifications in Oregon, and derives substantial revenue and profits for their selling its products, designs, modifications,

accessories and parts to Oregon customers and also from products, designs, modifications, accessories and parts purchased for Oregon-based aircraft, including the subject helicopter, and maintains and cultivates continuous and systematic contacts with Oregon and purposefully avails itself of the privilege of conducting business in Oregon.

37.    LifePort sold its air ambulance designs, products, and modifications for AS350B3 helicopters to the AirMedCare Network – Global, Reach Air, and Med Trans – for installation in, and modification of, the subject helicopter for their AirLink air ambulance operation in Oregon.

**Starr Companies**

38.    Defendant Starr Adjustment Services, Inc. and Starr Adjustment Services, Inc. d/b/a Starr Companies, ("Starr Adjustment") is a Delaware corporation with its principal place of business in Georgia, and is registered to do business in the State of Oregon, with its registered agent in Marion County: CT Corporation System, 780 Commercial St SE Suite 100, Salem, Oregon 97301.

39.    Defendant Starr Underwriting Agency, Inc., formerly known as Starr Aviation Agency, Inc., and Starr Underwriting Agency, Inc. d/b/a Starr Companies ("Starr Underwriting"), is a New York corporation with its principal place of business in New York, and is registered to do business in the State of Oregon, with its registered agent in Marion County: CT Corporation System, 780 Commercial St SE Suite 100, Salem, Oregon 97301.

40.    Defendant Starr Insurance Holdings, Inc. d/b/a Starr Companies ("Starr Holdings"), is a Nevada corporation with its principal place of business in New York.

41.    Defendant Starr Global Holdings AG d/b/a Starr Companies ("Starr Global Holdings"), is a Switzerland company or corporation with its headquarters at Baarerstrasse 101, 6300 Zug, Switzerland.

42.     Defendant Starr International Company, Inc. a/k/a Starr International Company AG d/b/a Starr Companies ("Starr International"), is a Switzerland company or corporation with its headquarters at Baarerstrasse 101, 6300 Zug, Switzerland.

43.     Defendant Starr Companies is "the worldwide marketing name for the operating insurance and travel assistance companies and subsidiaries of Starr International Company, Inc. and for the investment business of C. V. Starr & Co., Inc., and its subsidiaries."  Defendant Starr Companies includes Starr Adjustment Services, Inc., Starr Underwriting Agency, Inc., Star Insurance Holdings, Inc., Starr Global Holdings AG, and Starr International Company, Inc., as well as any other companies or entities in their corporate subsidiary or parent lineage and company/corporate family acting under the marketing name of "Starr Companies" and involved in the intentional and negligent spoliation of evidence as alleged herein.

44.     Defendants Starr Adjustment, Starr Underwriting, Starr Holdings, Starr Global Holdings, Starr International, and Starr Companies, are sometimes hereinafter collectively referred to as "the Starr Companies" or "the Starr Companies Defendants."

45.     The Starr Companies are in the business of providing insurance and adjusting insurance claims throughout the United States, including purposely conducting substantial business in Oregon continuously and systematically, and by intentionally cultivating a substantial market for their products and services and generating substantial revenue for the Starr Companies, in Oregon.

46.     The Starr Companies act collectively, as a singular enterprise, and as agents and each on behalf of some or all of the others, and of the Starr Companies' jurisdictional contacts with Oregon as it relates to this matter are shared among some or all of the other entities comprising the Starr Companies, and operate under their collective worldwide marketing name "Starr Companies."

47.     Additionally, as set forth above, Starr Adjustment and Starr Underwriting are specifically registered to conduct business in the State of Oregon, and maintain their registered agent for service of process in Marion County, Oregon.

48.     The Starr Companies also intentionally reached into Oregon and orchestrated the retrieval and removal of the wreckage of the Airbus Helicopters AS350B3 helicopter, registered as N851AL ("the subject helicopter") that crashed on May 18, 2022 in Christmas Valley, Oregon, injuring the Oregon resident plaintiffs ("the helicopter crash" or "the crash").

49.     The Starr Companies intentionally and negligently reached into Oregon and harmed the Oregon resident plaintiffs in Oregon by allowing unsupervised private inspections of critical physical evidence the Starr Companies had retrieved and removed from Oregon – the subject helicopter – and their removal of vital components and pieces of evidence and recorded flight and performance data, enabling and facilitating their spoliation, and then intentionally having the wreckage destroyed in its entirety, diminishing the value of the severely injured Oregon resident plaintiffs' claims against third parties for the cause of the crash and crashworthiness.

### JURISDICTION AND VENUE

50.     This court has diversity of citizenship jurisdiction under 28 U.S.C. § 1332 in that the amount in controversy exceeds $75,000 and the action is between citizens of different states, and plaintiff and plaintiffs are all citizens of the State of Oregon while defendants – though they maintain continuous and systematic contacts with Oregon – are not citizens of Oregon for purposes of Section 1332.

51.     Venue is appropriate in the District of Oregon under 28 U.S.C. § 1391 in that a substantial part the events giving rise to the claim occurred in Oregon.

52.    Divisional venue is appropriate in the Eugene Division of the District of Oregon under LR 3-2 in that a substantial part of the events or omissions giving rise to the claim occurred in the Eugene Division, as follows:

- Plaintiffs were injured in an air ambulance helicopter crash where the flight departed from a helipad at St. Charles Bend Hospital in Bend, Oregon in Deschutes County, in the Eugene Division, after completing a mission to transfer a patient there, and refueling there, and was for purposes of transporting another medical patient back to St. Charles Bend Hospital in Deschutes County in the Eugene Division.

- The subject air ambulance flight departing from St. Charles Bend Hospital in Deschutes County was conducted right after a mission transferring a patient to St. Charles Bend Hospital, and was for purposes of transporting another medical patient to St. Charles Bend Hospital in Deschutes County in the Eugene Division as part of the air ambulance operator, Med Trans', ongoing, systematic, and continuous air ambulance services provided to St. Charles Bend Hospital in Deschutes County in the Eugene Division with which, on information and belief, Med Trans has an agreement to provide continuous and exclusive air ambulance/medical transport services in Deschutes County in the Eugene Division, and where Med Trans maintains and stations a permanent air ambulance aircraft in Deschutes County in the Eugene Division, while also providing air ambulance services to and from St. Charles Bend Hospital in Deschutes County in the Eugene Division from its other air ambulance aircraft, including the subject helicopter.

- Following the crash, plaintiffs were transported to St. Charles Bend Hospital in Bend, Oregon in Deschutes County, in the Eugene Division, the same hospital in the Eugene Division that the subject air ambulance flight had earlier delivered a patient, and was servicing for another patient transfer when the crash occurred.

- After their initial medical treatment at St. Charles Bend Hospital in Deschutes County in the Eugene Division, plaintiffs Jason Halsey and Michael McGarry received ongoing medical treatment for their injuries from medical providers in Deschutes County, in the Eugene Division.

- Plaintiff Jason Halsey, who was severely injured in the crash and treated at St. Charles Bend Hospital in Deschutes County in the Eugene Division and received ongoing treatment for his injuries in Deschutes County in the Eugene Division, is a resident of Redmond, Oregon in Deschutes County in the Eugene Division, and the harm he suffered from defendants' spoliation of evidence as set forth below occurred where he resides in Deschutes County in the Eugene Division.

- In addition to maintaining a permanent physical presence and stationed air ambulance aircraft at St. Charles Bend Hospital in Deschutes County in the Eugene Division and providing continuous and systematic air ambulance services for St. Charles Bend Hospital in Deschutes County in the Eugene Division, air ambulance operator, Med Trans' registered agent in Oregon is in Marion County, in the Eugene Division, and Med Trans has two air ambulance operations fixed in and operating out of Deschutes County, in the Eugene Division.

- Defendant Reach Air's registered agent in Oregon is in Marion County, in the Eugene Division, has an air ambulance operation fixed in and operating out of Douglas County, in the Eugene Division, and has another air ambulance operation fixed in and operating out of Coos County, in the Eugene Division.

- Defendant Safran's registered agent in Oregon is in Marion County, in the Eugene Division.

- Defendant Starr Adjustment's registered agent in Oregon is in Marion County, in the Eugene Division.

- Defendant Starr Underwriting's registered agent in Oregon is in Marion County, in the Eugene Division.

## AS350 HELICOPTER CONTROLABILITY ISSUES, CRASHES, AND THE MAY 3, 2022, EMERGENCY AIRWORTHINESS DIRECTIVE

53.     The subject helicopter, an Airbus Helicopters AS350B3 helicopter, registered as N851AL, is part of the Airbus Helicopters (formerly Eurocopter) AS350 helicopter product line.

54.     AS350 helicopters have a history of crashes involving flight control systems malfunctions.

55.     Airbus attempts to exert heavy influence on official government investigations of AS350 crashes, including NTSB investigations, working to shift attention away from any potential product issues, including altering evidence in private and without documentation of its activities.

56.     For example, following the crash of an AS350B2 helicopter in Seattle, Washington, Airbus privately disassembled the hydraulic servos with little to no photo and video documentation, and the tail rotor servo had unnecessary and excessive distress damage

introduced during the disassembly, which had the effect of masking and altering evidence of the condition of the servos.

57.     Just days before the crash that is the subject of this lawsuit, another product issue emerged that could result in loss of control of Airbus AS350 helicopters.  Flexball cables that are critical for helicopter flight controls, were defectively manufactured, with the potential for increased friction that could result in jamming of the flight controls.  The FAA published an Emergency Airworthiness Directive concerning Airbus' defective flexball cables on May 3, 2022.

58.     The helicopter crash occurred just two weeks later, on May 18, 2022, and on information and belief, action was not taken to ensure the subject helicopter did not have any defective flexball cables.

## THE HELICOPTER CRASH

59.     On May 18, 2022, plaintiffs sustained severe injuries as occupants of the subject helicopter (Airbus Helicopters AS350B3 helicopter, registered as N851AL) in the helicopter crash.

60.     Plaintiffs were all employed by defendant Med Trans as part of its "AirLink Critical Care Transport" air ambulance operations, continuously and systematically serving St. Charles Bend Hospital in Bend, Oregon, and were on the job when the crash occurred.

61.     Specifically, plaintiffs Halsey, Backer, and Lee were serving as medical crew on-board the subject helicopter, and plaintiff McGarry was serving as pilot of the subject helicopter.

62.     Plaintiffs were not employed by Global or Reach Air.

63.     The day of the crash, plaintiffs were given the mission to transfer a medical patient to Med Trans' continuous and systematic Deschutes County customer, St. Charles Bend Hospital in Bend Oregon via the subject helicopter.

64.     Following completion of the patient transfer to St. Charles Bend Hospital in Bend, the subject helicopter was refueled at the St. Charles Bend Hospital helipad and then was dispatched on a new assignment to pick up a patient at the Christmas Valley Airport for transport back to St. Charles Bend Hospital in Bend.

65.     As the helicopter landed to pick up the patient the controls or the engine malfunctioned and the helicopter suddenly surged forward and then began to rotate out of control and crashed, resulting in severe injuries to all of the plaintiffs.

66.     Following the crash, the plaintiffs were transported to St. Charles Bend Hospital in Bend for treatment.

**ALTERATION AND DESTRUCTION OF EVIDENCE AFTER THE CRASH**

67.     In the aftermath of the crash, Global, Reach Air, and Med Trans allowed the Starr Companies, which insured the subject helicopter, to arrange for an aircraft salvage company in California to retrieve the helicopter wreckage from the crash site in Oregon and transport it to its aircraft wreckage storage site in California.

68.     Airbus eagerly contacted the NTSB and the Starr Companies "itching" to conduct a private inspection of the subject helicopter wreckage, expressing specific concern with inspecting the helicopter for the defective flexball cables, as soon as possible.

69.     Although the NTSB usually takes custody of an aircraft wreckage when an airplane or helicopter crashes in the United States for a period of time in order to inspect and analyze the wreckage as part of its official investigation, in this instance, the NTSB specifically declined to take custody of the subject helicopter wreckage.

70.     As a result, the aircraft helicopter wreckage was at all times following the crash under the control of Global, Reach Air, Med Trans, and the Starr Companies.

71.     The Starr Companies are in the business of insuring airplanes and helicopters and have standard practices and protocols, which are also standard in the aircraft insurance industry in the United States, of preserving the wreckages of aircraft following crashes as potential and likely evidence in civil proceedings after the crash.  This includes recognition and understanding by the Starr Companies and the aircraft insurance industry as a whole in the United States, that those injured in airplane or helicopter crashes (or their heirs and estates in the case of fatalities) are among the "interested parties" that have a strong interest in preservation of the aircraft wreckage as potential and likely evidence in civil proceedings following the crash, as are the aircraft and aircraft engine manufacturers and aircraft operators.

72.     Consequently, the Starr Companies, and the aircraft insurance industry in the United States as a whole, has standard practices and protocols to ensure preservation and prevent spoliation of the aircraft wreckage as potential and likely critical physical evidence for all "interested parties" following the crash that includes ensuring proper storage of the wreckage, and prohibiting any of the interested parties from accessing the wreckage without first notifying all of the interested parties and inviting them to attend the inspection.  The Starr Companies and the aircraft insurance industry prohibit private inspections that exclude and provide no notice to obvious interested parties, such as the actual injured victims of the crash, and also prohibit parties from privately removing critical components and data from the wreckage storage location without any invitation or notice to obviously interested parties, such as the actual injured victims of the crash, and then conducting further private inspections and alteration of any such removed components and data without any notice or invitation to obviously interested parties, such as the actual injured victims of the crash.

73.     Such evidence preservation, and spoliation prevention, standards, protocols, practices, and safeguards of the Starr Companies and the aviation insurance industry, are with

full recognition that any personal injury or wrongful death civil lawsuits are typically under a two or three year statute of limitations to file suit, and that the wreckage must be fully preserved throughout that period unless notice otherwise is given to all interested parties, especially the most obviously interested parties such as the injured victims of the crash, with sufficient time and opportunity for such interested parties to take appropriate action to take over preservation of the wreckage as critical physical evidence should they choose.

74.    Both Airbus and Safran are also well aware of these standard insurance industry evidence preservation, and spoliation prevention, practices, protocols, standards, and safeguards. But they nevertheless eagerly sought to pounce on the potential to conduct a private inspection of the subject helicopter wreckage just days after the crash, which they knew and understood was not under NTSB custody or jurisdiction, without the presence of, or any notice or invitation to the plaintiffs or their representatives.

75.    The Starr Companies, Global, Reach Air, and Med Trans, specifically authorized Airbus and Safran to conduct an inspection of the subject helicopter wreckage in late May or early June 2022 at the Plain Parts facility in California without any invitation or notice to the plaintiffs or their representatives.  Indeed, without any mention of them whatsoever, or even the slightest effort to contact or inform them.  The Starr Companies, Global, Reach Air, and Med Trans further did not require Airbus or Safran to sufficiently document or record their activities to ensure proper documentation of their inspection and that no secret alteration of any evidence occurred.

76.    This was in violation of the Starr Companies', as well as the aviation insurance industry in the United States', evidence preservation and spoliation prevention practices, protocols, standards, and safeguards.

77.    The Starr Companies, Global, Reach Air, and Med Trans, further specifically authorized Airbus and Safran to each remove critical evidence during their inspection of the subject helicopter wreckage in late May or early June 2022 at the Plain Parts facility in California to do what they wanted with it, privately, at their own facilities, and all without any invitation or notice to the plaintiffs or their representatives, or even the slightest effort to contact or inform them.  This was in further violation of the Starr Companies', as well as the aviation insurance industry in the United States', evidence preservation and spoliation prevention practices, protocols, standards, and safeguards.

78.    Airbus took the flight data recorder from the wreckage and conducted its own private inspection of it and its data, without any notice or invitation to the injured plaintiffs or their representatives, and all without proper preservation or documentation or any other safeguards to ensure nothing was manipulated and altered, and forever destroyed and spoliated the critical flight data recorder evidence from the crash.

79.    Safran took the engine data recorder from the wreckage and conducted its own private inspection of it and its data, without any notice or invitation to the injured plaintiffs or their representatives, and all without proper preservation or documentation or any other safeguards to ensure nothing was manipulated and altered, and forever destroyed and spoliated the critical flight data recorder evidence from the crash.

80.    Sometime after the crash, and the immediate and irreparable spoliation of evidence just days after the crash described above, Plaintiff McGarry retained an attorney to represent him with respect to his injuries in the crash.

81.    On October 21, 2022, McGarry's attorney wrote to Med Trans expressing the importance of the subject helicopter wreckage as evidence for potential civil claims McGarry

might bring, requesting its proper preservation, and also asking to be notified when the NTSB has relinquished custody of the wreckage so that a wreckage inspection could be scheduled.

82.    Med Trans ignored and did not respond to McGarry's attorney's October 21, 2022 preservation and inspection request letter.  Med Trans thus failed to inform McGarry's attorney of the fact that the NTSB had never taken custody of the wreckage, and that private Airbus and Safran inspections that had been permitted to occur months earlier and the resulting removal and destruction and alteration of critical components and their flight/engine data recording.

83.    On April 24, 2023, McGarry's attorney again wrote to Med Trans, enclosing a copy of the October 21, 2022 letter that Med Trans had ignored, and again asking for a response, stating that "time is critical", and specifically asking Med Trans to communicate with the aircraft insurer about the wreckage preservation and McGarry's request for an inspection.

84.    Rather than responding to McGarry's April 24, 2023 follow-up letter, Med Trans, Global, Reach Air, and the Starr Companies instead immediately sold the subject helicopter wreckage as salvage to Plain Parts, which they, and anyone else in the industry, all knew meant the wreckage would then be destroyed by Plain Parts with some salvageable parts/components sold off as salvage parts/components.

85.    Med Trans, Global, Reach Air, and the Starr Companies finalized the deal to sell off the subject helicopter wreckage as salvage to Plain Parts – thus knowingly, intentionally, and maliciously ensuring its complete destruction and the permanent loss of critical evidence specifically requested by McGarry's counsel on October 21, 2022 and April 24, 2023.

86.    The timing of Med Trans, Global, Reach Air, and the Starr Companies' complete destruction and intentional spoliation of the subject helicopter wreckage, occurring immediately after McGarry's counsel's April 24, 2023 follow-up letter, was not coincidental but rather reflects their intentional, bad faith, and malicious specific plan, purpose, and desire, to cover-up

their spoliation of evidence in the immediate aftermath of the crash by permitting Airbus and Safran private access to and alteration and spoliation of the subject helicopter wreckage without proper documentation or any safeguards to ensure evidence was not altered, and their private removal of critical data recording components with alteration, destruction, and spoliation of the data recorder components and the recorded data.

87.    Meanwhile, counsel for McGarry was retained by plaintiff Halsey, and in September 2023 received a FOIA response from the NTSB – a rarity because the NTSB usually refuses to respond to FOIA requests, instead taking the position that it has no FOIA obligations beyond what it decides to eventually post on its online public "docket" for a crash – that included a series of heavily redacted emails revealing for the first time that the NTSB had never taken custody of the wreckage, that the Starr Companies were the aircraft insurer, and the Airbus/Safran spoliation that had occurred in the immediate aftermath of the crash, in late May or early June 2022, as specifically permitted by the Starr Companies with no requirement to notify or invite any of the injured parties, and with no requirements for documentation or recording of their activities to ensure proper documentation of their inspection and that no secret alteration of any evidence could occur.

88.    By the time the attorney for McGarry and Halsey were able to acquire those heavily redacted emails from the NTSB in September 2023, the subject helicopter wreckage and its recorded data and other associated evidence had already been forever destroyed and lost months earlier.  But this was not yet known to the attorney for McGarry and Halsey, or to any of the plaintiffs.

89.    In early 2024, the undersigned attorneys began representing plaintiffs McGarry and Halsey.  As the heavily redacted emails acquired from the NTSB in September 2023 were the only source of information available to the injured victims of the crash at that time revealing

the Starr Companies' involvement or that the wreckage had been taken to Plain Parts in California with the NTSB never taking custody of the wreckage (highly unusual for any airplane/helicopter crash involving serious injuries or deaths), McGarry and Halsey's new attorneys reached out to the Starr Companies and to Plain Parts for information.

90.    On March 14, 2024, the Starr Companies informed McGarry and Halsey's attorneys that the wreckage had been sold for salvage and thus destroyed in May 2023, and that Airbus had before that removed the flight data recorder to its facilities for private inspection and data access, and that Safran had removed the engine data recorder to its facilities for private inspection and data access.

91.    McGarry and Halsey's attorneys received confirmation on March 18, 2024 from Plain Parts that the helicopter wreckage was purchased "as parts" and that Plain Parts does "not have any of the helicopter left."

92.    On March 19, 2024, the Starr Companies informed McGarry and Halsey's attorneys that the Starr Companies refused to provide any further information or documents regarding the subject helicopter wreckage or the spoliation that had occurred without a subpoena.

93.    The undersigned counsel were subsequently additionally retained by the other two occupants of the subject helicopter injured in the crash, plaintiffs Backer and Lee.

### FIRST CLAIM

### (Strict Products Liability)

### *Plaintiffs v. Airbus, Safran, Global, Reach Air, and LifePort, Inc.*

94.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 93 above.

95.    Airbus is a helicopter manufacturer and designed, manufactured, sold, and distributed the subject helicopter into Oregon.

96.    Safran is a helicopter engine manufacturer and designed, manufactured, and sold the helicopter engine to Airbus for incorporation in the subject helicopter that Airbus sold and distributed into Oregon.

97.    Global and Reach Air modified the interior of the subject helicopter with the seats and other air ambulance modifications designed and sold by LifePort, and sold or leased the helicopter for use as an air ambulance in Oregon by Med Trans as an "AirLink Critical Care Transport" air ambulance.

98.    LifePort, Inc. designed, manufactured, and sold its air ambulance and seating modifications that were incorporated in the subject helicopter that was distributed into Oregon.

*Cause of the crash*

99.    A substantial factor in, and proximate cause of, the crash occurring and the resulting severe injuries to plaintiffs was that the subject helicopter and its systems, cables, and components, as designed, manufactured, and sold by Airbus, and as sold or leased by Global and Reach Air, was in a condition unreasonably dangerous to the user or consumer in one or more of the following particulars:

a.    One or more flexball cable was defectively designed or manufactured and malfunctioned resulting in loss of control of the subject helicopter and the crash; and

b.    The subject helicopter's control systems were defectively designed or manufactured, resulting in loss of control of the helicopter and the crash.

100.    Additionally or alternatively a substantial factor in, and proximate cause of, the crash occurring and the resulting severe injuries to plaintiffs was that the helicopter engine as designed, manufactured, and sold by Safran and Airbus, and as sold or leased by Global and Reach Air, was in a condition unreasonably dangerous to the user or consumer in that it was defectively designed or manufactured, resulting in loss of control of the helicopter and the crash.

101.    Airbus, Safran, Global, and Reach Air's negligent, reckless, and intentional spoliation has deprived plaintiffs of critical proof of the above allegations, warranting one or more evidentiary inferences in favor of plaintiffs' allegations.

102.    In the alternative, a substantial factor in, and proximate cause of, the crash occurring and resultant severe injuries to the plaintiffs was that there was an indeterminant defect of the subject helicopter and its systems, cables, and components, or its engine, resulting in a malfunction that caused the crash.  The specific defect is undiscoverable because of Airbus, Safran, Global, and Reach Air's negligent, reckless, and intentional spoliation, which has deprived plaintiffs of critical evidence and ability to prove the defect.  Such spoliation has further deprived plaintiffs of the ability to prove manifestation of the defect, all warranting one or more evidentiary inferences in favor of plaintiffs' allegations.

*Crashworthiness*

103.    A substantial factor in, and proximate cause of, the severity of injuries to plaintiffs in the crash was that the subject helicopter sold by Airbus, and as sold or leased by Global and Reach Air, was in a condition unreasonably dangerous to the user or consumer in that it lacked appropriate occupant protection features and had seats and other interior features that were defective in design such that occupants of the subject helicopter were likely to be more severely injured in a crash and were susceptible to more severe injuries in a crash that could otherwise be prevented or reduced by better design and occupant protection features and design considerations, resulting in each of the plaintiffs being more severely injured in the crash.

104.    Additionally a substantial factor in, and proximate cause of, the severity of injuries to plaintiffs in the crash was that the air ambulance and seating modifications to the subject helicopter, designed, manufactured, and sold by LifePort, and installed in the subject helicopter by Global and Reach Air, which then sold or leased the subject helicopter for use as an

air ambulance in Oregon, were in a condition unreasonably dangerous to the user or consumer, and rendered the subject helicopter unreasonably dangerous to the user or consumer, in that the modifications lacked appropriate occupant protection features and had seats and other interior features that were defective in design such that occupants of the subject helicopter were likely to be more severely injured in a crash and were susceptible to severe injuries in a crash that could otherwise be prevented or reduced by better design and occupant protection features and design considerations, resulting in each of the plaintiffs being more severely injured in the crash.

105.    Airbus, Global, and Reach Air's negligent, reckless, and intentional spoliation has deprived plaintiffs of critical proof of the above crashworthiness allegations, warranting one or more evidentiary inferences in favor of plaintiffs' allegations.

106.    As a result of these dangerous defects, plaintiffs were all severely injured in the helicopter crash and are entitled to recover damages including their pain and suffering and ongoing pain and suffering, mental and emotional distress, medical expenses, lost past earnings, loss of earning capacity, disability, out of pocket expenses, and all other damages recoverable by law in amounts to be determined by the jury and which exceed the jurisdictional minimum under 28 U.S.C. § 1332.

107.    Plaintiffs' strict product liability claims against Global and Reach Air do not arise out of and are not in the course of or related to employment with Global or Reach Air as none of the plaintiffs were employed by Global or Reach Air.

108.    Plaintiffs anticipate seeking punitive damages against defendants Airbus, Safran, Global, and Reach Air.

## SECOND CLAIM

## (Negligence)

### *Plaintiffs v. Airbus, Safran, Global, Reach Air, and LifePort, Inc.*

109.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 108 above.

*Cause of the crash*

110.    A substantial factor in, and proximate cause of, the crash occurring and the resulting severe injuries to plaintiffs was the negligence of Airbus in one or more of the following particulars:

　　　　a.    One or more flexball cable was defectively designed or manufactured and malfunctioned resulting in loss of control of the subject helicopter and the crash; and

　　　　b.    The subject helicopter's control systems were defectively designed or manufactured, resulting in loss of control of the helicopter and the crash.

111.    Additionally or alternatively, a substantial factor in, and proximate cause of, the crash occurring and the resulting severe injuries to plaintiffs was the negligence of Airbus and Safran in that the subject helicopter's engine was defectively designed or manufactured, resulting in loss of control of the helicopter and the crash.

112.    Airbus and Safran's negligent, reckless, and intentional spoliation has deprived plaintiffs of critical proof of the above allegations, warranting one or more evidentiary inferences in favor of plaintiffs' allegations.

113.    Additionally or alternatively, a substantial factor in, and proximate cause of, the crash occurring and the resulting severe injuries to plaintiffs was the negligence of Global and Reach Air in their operations and procedures in patient transfer operations.

*Crashworthiness*

114.    A substantial factor in, and proximate cause of, the severity of injuries to plaintiffs in the crash was the negligence of Airbus in designing, manufacturing, and selling the subject helicopter in a condition unreasonably dangerous to the user or consumer in that it lacked appropriate occupant protection features and had seats and other interior features that were defective in design such that occupants of the subject helicopter were likely to be more severely injured in a crash and were susceptible to more severe injuries in a crash that could otherwise be prevented or reduced by better design and occupant protection features and design considerations, resulting in each of the plaintiffs being more severely injured in the crash.

115.    Additionally, a substantial factor in, and proximate cause of, the severity of injuries to plaintiffs in the crash was the negligence of LifePort, Global, and Reach Air, in that the air ambulance and seating modifications to the subject helicopter, designed, manufactured, and sold by LifePort, and installed in the subject helicopter by Global and Reach Air, which then sold or leased the subject helicopter for use as an air ambulance in Oregon, were in a condition unreasonably dangerous to the user or consumer, and rendered the subject helicopter unreasonably dangerous to the user or consumer, in that the modifications lacked appropriate occupant protection features and had seats and other interior features that were defective in design such that occupants of the subject helicopter were likely to be more severely injured in a crash and were susceptible to severe injuries in a crash that could otherwise be prevented or reduced by better design and occupant protection features and design considerations, resulting in each of the plaintiffs being more severely injured in the crash.

116.    Airbus, Global, and Reach Air's negligent, reckless, and intentional spoliation has deprived plaintiffs of critical proof of the above crashworthiness negligence allegations, warranting one or more evidentiary inferences in favor of plaintiffs' allegations.

117.    As a result of defendants Airbus, Safran, Global, Reach Air, and LifePort's negligence as set forth above, plaintiffs were all severely injured in the helicopter crash and are entitled to recover damages including their pain and suffering and ongoing pain and suffering, mental and emotional distress, medical expenses, lost past earnings, loss of earning capacity, disability, out of pocket expenses, and all other damages recoverable by law in amounts to be determined by the jury and which exceed the jurisdictional minimum under 28 U.S.C. § 1332.

118.    Plaintiffs' negligence claims against Global and Reach Air do not arise out of and are not in the course of or related to employment with Global or Reach Air as none of the plaintiffs were employed by Global or Reach Air.

119.    Plaintiffs anticipate seeking punitive damages against defendants Airbus, Safran, Global, and Reach Air.

### THIRD CLAIM

**(Intentional and/or Negligent Spoliation of Evidence –
*McGuffin v. Dannels*, No. 6:20-CV-01163-MK)**

*Plaintiffs v. Airbus, Safran, Global, Reach Air, Med Trans, and the Starr Companies*

120.    Plaintiffs reallege and incorporate by reference paragraphs 1 through 119 above.

121.    Defendants Airbus, Safran, Global, Reach Air, Med Trans, and the Starr Companies, each had a duty to preserve the evidence of the subject helicopter and its components, engine, cables, data recording devices, and recorded data, as set forth in detail above, and were all well aware of the interests of the plaintiffs who were severely injured in the helicopter crash in the preservation, inspection, and analysis of the subject helicopter wreckage, and its components, engine, cables, data recording device, and recorded data, as potential and likely evidence in civil proceedings after the crash.

122.    Indeed, the Starr Companies, and the aircraft insurance industry in the United States as a whole of which they are a part, has standard practices and protocols to ensure preservation, and prevent spoliation, of the aircraft wreckage as potential and likely critical physical evidence for all "interested parties" following the crash that includes ensuring proper storage of the wreckage, and prohibiting any of the interested parties from accessing the wreckage unless they notify all of the interested parties and invite them to attend the inspection. The Starr Companies and the aircraft insurance industry of which they are a part prohibit private inspections that exclude and provide no notice to obvious interested parties, such as the actual injured victims of the crash, and also prohibit parties from privately removing critical components and data from the wreckage storage location without any invitation or notice to obviously interested parties, such as the actual injured victims of the crash, and then conducting further private inspections and alteration of any such removed components and data without any notice or invitation to obviously interested parties, such as the actual injured victims of the crash.

123.    Such evidence preservation, and spoliation prevention, standards, protocols, practices, and safeguards of the Starr Companies and the aviation insurance industry, are with full recognition that any personal injury or wrongful death civil lawsuits are typically under a two or three year statute of limitations to file suit, and that the wreckage must be fully preserved throughout that period unless notice otherwise is given to all interested parties, especially the most obviously interested parties such as the injured victims of the crash, with sufficient time and opportunity for such interested parties to take appropriate action to take over preservation of the wreckage as critical physical evidence should they choose.

124.    These Starr Companies and aviation insurance industry evidence preservation and spoliation prevention standards, protocols, practices and safeguards, and awareness of the plaintiffs' interests as injured helicopter crash victims, form part of and serve as evidence of their

duties and the high degree of their culpability in egregiously throwing all of these things out the window to the detriment of plaintiffs here.

125.    Both Airbus and Safran are also well aware of these standard insurance industry evidence preservation, and spoliation prevention, practices, protocols, standards, and safeguards. But they nevertheless eagerly sought to pounce on the potential to conduct a private inspection of the subject helicopter wreckage just days after the crash, which they knew and understood was not under NTSB custody or jurisdiction, without the presence of, or any notice or invitation to the plaintiffs or their representatives, as it was their goal and purpose to control the narrative regarding the subject helicopter wreckage and what they purportedly found or did not find, including by unobserved or supervised alteration, destruction, and grossly insufficient documentation.

126.    In violation of their duties, the Starr Companies, Global, Reach Air, and Med Trans, intentionally, recklessly, maliciously, and/or negligently specifically authorized Airbus and Safran to conduct an inspection of the subject helicopter wreckage in late May or early June 2022 at the Plain Parts facility in California without any invitation or notice to the plaintiffs or their representatives, and further specifically authorized Airbus and Safran to each remove critical evidence during their inspection of the subject helicopter wreckage in late May or early June 2022 at the Plain Parts facility in California to do what they wanted with it, privately, at their own facilities, and all without any invitation or notice to the plaintiffs or their representatives, or even the slightest effort to contact or inform them.

127.    Airbus, in further violation of its duties to preserve evidence, further intentionally, recklessly, maliciously, and/or negligently spoliated evidence by taking the flight data recorder from the wreckage and conducting its own private inspection of it and its data, without any notice or invitation to the injured plaintiffs or their representatives, and all without proper

preservation or documentation or any other safeguards to ensure nothing was manipulated and altered, and forever destroyed and spoliated the critical flight data recorder evidence from the crash, and/or the trustworthiness of any data that Airbus purports to have privately downloaded with no independent ability to verify such data has not been manipulated or modified.

128.    Safran, in further violation of its duties to preserve evidence, further intentionally, recklessly, maliciously, and/or negligently spoliated evidence by taking the engine data recorder from the wreckage and conducting its own private inspection of it and its data, without any notice or invitation to the injured plaintiffs or their representatives, and all without proper preservation or documentation or any other safeguards to ensure nothing was manipulated and altered, and forever destroyed and spoliated the critical flight data recorder evidence from the crash, and/or the trustworthiness of any data that Safran purports to have privately downloaded with no independent ability to verify such data has not been manipulated or modified.

129.    The Starr Companies, Global, Reach Air, and Med Trans further violated their duties to preserve evidence by ignoring the specific requests of the attorney for one of the plaintiffs to inspect the wreckage, for information regarding its status, for contact with the aircraft insurer, and for its preservation as of critical importance to likely civil claims the plaintiff, who was severely injured in the helicopter crash, was likely to bring.

130.    Instead, the Starr Companies, Global, Reach Air, and Med Trans, after receiving the second wreckage status/preservation letter from plaintiff McGarry's attorney in April 2023, instead of responding, egregiously decided to cover-up their earlier spoliation in the immediate aftermath of the crash by giving Airbus and Safran unprecedented free reign to privately spoliate evidence without any invitation or notice to the actual crash victims, by getting rid of and destroying the wreckage entirely in May 2023.

131.    Defendants Airbus, Safran, the Starr Companies, Global, Reach Air, and Med Trans were all on notice of plaintiffs' strong interest in the subject helicopter wreckage for potential and likely civil claims and of the critical importance of the wreckage to such claims, and nevertheless spoliated this critical evidence without any notice to plaintiffs, and likely did so specifically because of, and to destroy or diminish, the evidentiary value of the wreckage to the plaintiffs and/or with utter reckless disregard for the harm to plaintiffs caused by their egregious spoliation.

132.    As a direct and proximate result of the actions of Airbus, Safran, the Starr Companies, Global, Reach Air, and Med Trans in spoliating evidence, the value of plaintiffs' claims in this lawsuit were diminished and plaintiffs are entitled to recovery of any diminished value of their claims. *See McGuffin v. Dannels*, No. 6:20-CV-01163-MK, 2021 WL 4453106 (D. Or. July 27, 2021) *report and recommendation adopted*, No. 6:20-CV-01163-MK, 2021 WL 4449975 (D. Or. Sept. 28, 2021); *McGuffin v. Dannels*, No. 3:21-CV-1719-MK, 2022 WL 17979966, at *15 (D. Or. Sept. 16, 2022), *report and recommendation adopted*, No. 6:20-CV-01163-MK, 2022 WL 17979748 (D. Or. Dec. 28, 2022).

133.    The harm suffered by plaintiffs from Global, Reach Air, or Med Trans' spoliation of evidence did not arise out of and was not in the course of employment with Med Trans, and plaintiffs were never employees of Global or Reach Air.

134.    Plaintiffs anticipate seeking punitive damages against defendants Airbus, Safran, Global, and Reach Air.

WHEREFORE, plaintiffs pray for judgment against defendants Airbus, Safran, Global, Reach Air, and LifePort for all recoverable damages, including their pain and suffering and ongoing pain and suffering, mental and emotional distress, medical expenses, lost past earnings, loss of earning capacity, disability, out of pocket expenses, and all other damages recoverable by law in amounts to be determined by the jury and which exceed the jurisdictional minimum under

28 U.S.C. § 1332, together with costs, disbursements, and interest, and for such other relief as the Court deems just and equitable.

Plaintiffs further pray for judgment against defendants Airbus, Safran, the Starr Companies, Global, Reach Air, and Med Trans for any diminished value of their claims resulting from their spoliation of evidence, in an amount to be determined by a jury, together with costs, disbursements, and interest, and for such other relief as the Court deems just and equitable.

## **JURY DEMAND**

Plaintiffs demand trial by jury of twelve (12) on all of the above counts.

DATED this 16th day of April, 2024.


KRUTCH LINDELL BINGHAM JONES, P.S.


 s/ Matthew Clarke
Matthew Clarke, OSB # 022758
KRUTCH LINDELL BINGHAM JONES P.S.
5 Centerpointe Drive Suite 400
Lake Oswego, OR 97035
(503) 210-1987
mkc@krutchlindell.com


 s/ James T. Anderson
James T. Anderson, OSB # 152404
KRUTCH LINDELL BINGHAM JONES P.S.
3316 Fuhrman Avenue East, Suite 250
Seattle, WA 98102
(206) 682-1505
jta@krutchlindell.com

*Attorneys for Plaintiffs*